611 So.2d 988 (1992)
Anthony Earl WHIGHAM
v.
STATE of Mississippi.
No. 07-KA-59480.
Supreme Court of Mississippi.
December 31, 1992.
*989 Rex K. Jones, Barron McSwain, Hattiesburg, for appellant.
Michael C. Moore, Atty. Gen., Leyser Q. Morris, Jackson, for appellee.
*990 EN BANC.
HAWKINS, Presiding Justice, for the Court:
Anthony Earl Whigham appeals his conviction in the circuit court of Forrest County of violation of Miss. Code Ann. § 97-5-23 (Supp. 1991), the sexual molestation of a minor female, and sentence to eight years imprisonment. Because of error in closing argument, we reverse.

FACTS
On May 15, 1987, the grand jury of Forrest County indicted Whigham for violation Miss. Code Ann. § 97-5-23. The indictment charged that at some time between December 1 and December 31, 1986, Whigham feloniously and lasciviously touched and rubbed with his hands Norma Pratt[1], a female child under fourteen years of age, with the felonious intent to satisfy his depraved licentious and lustful desire, and rubbed Norma's breast and vaginal area. Whigham was 23.
In 1986 Norma was thirteen years of age. Her natural parents are Stanley and Fiona Pratt. She has a brother, Stewart, who is three years her senior.
Whigham and Norma are first cousins. Whigham's mother, Phyllis, is a sister of Norma's father, Stanley. Phyllis and Whigham's father, Wesley, were divorced. Phyllis subsequently married Larry Bounds.
This cause came to trial July 17-18, 1988. The State's first witness was Nancy Easterling, a detective with the Hattiesburg Police Department. She testified that, following complaints made by Stanley and Fiona Pratt, Whigham was arrested on January 29, 1987, and at that time denied that he had had any physical contact with Norma for sexual purposes, but that he had "touched her on one occasion on her breast but he did not do it for the purpose of sexual reasons."
There was no dispute in this case but that Stanley Pratt had been sentenced to the penitentiary for some undisclosed reason and was serving time in a satellite prison. During his imprisonment Whigham had some kind of affair with Fiona Pratt, Norma's mother, and Whigham's aunt by marriage.
The second witness was Stewart Pratt. On direct examination he testified as follows:
Q. During the day that I just recalled to you, December of 1986, what, if anything, occurred at your apartment there?
A. I had come home from a friend's house, when I heard my sister crying. And Anthony was in my mother's room on top of my sister, holding her down, both hands behind her head with one hand up under her shirt and trying to kiss her and she was 
Q. When you say Anthony, who are you talking about?
A. Anthony Whigham.
.....
Q. And exactly where, and I want you to be precise, where was Anthony's hand?
A. Up under her shirt, with one of them, the other hand was holding both her hands above her head on the bed.
Q. When you say up under her shirt, where exactly was his hand?
A. On her breast 
.....
Q. In particular and precisely, where was Anthony's hand, on what particular part of the body on [Norma] was Anthony's hand.
A. On her breast.
Q. What was [Norma] doing?
A. She was crying.
Q. You saw this yourself?
A. Yes, I did.
*991 On cross-examination he testified as follows:
Q. Well, let me ask you this, you, of course have explained it to the prosecution about telling the truth and you know what perjury is and that sort of thing, whether there is any sort of an affair going on between this man here and your mother while your daddy was in jail?
A. Yes, it was.
Q. And as a result of that did your daddy make any statements to you with reference to what he was going to do to this fellow here?
A. No, he didn't.
Q. He did not?
A. He did not.
On direct examination [Norma] testified as follows:
Q. Back in December of 1986, did anything occur in that apartment?
A. Well, Anthony was holding me down on the bed and he had his hands in my shirt, kissing me and everything.
Q. Now when you say Anthony, who are talking about?
A. (Witness points).
.....
Q. What particular part of your body was he touching?
A. Here.
Q. Now when you say "here," what are you [talking about]?
A. Breast.
Q. Your breast?
A. Uh huh.
Q. And you said he was kissing on you?
A. Yes, sir.
Q. And you said he was holding your hands, how was he holding your hands?
A. He had his hand behind my head and one hand in my shirt and he was laying on top of me.
Q. Now, if you would, please described exactly how he had your hands.
A. He had his hand behind my head like this.
.....
Q. He was holding your right arm behind your head?
A. Yes, sir.
Q. What were you doing?
A. Trying to get up but he wouldn't let me up.
Q. Did anyone see Anthony on top of you?
A. My brother.
Q. What's your brother's name?
A. [Stewart].
Q. [Stewart Pratt]?
A. Yes, sir.
On cross-examination she testified as follows:
Q. Are you afraid of your father.
A. No, sir.
.....
A. Well, he asked me what all Anthony did and I told him and he asked me to come up here and tell the truth and that was it.
Q. Did he ask you anything about whether or not this boy was having any sort of an affair with your mother?
A. What?
Q. Did he ask you whether or not this defendant here was having any sort of an affair with your mother?
A. No, he didn't ask me.
Q. Huh?
A. No, he didn't ask me.
Q. Was he?
A. Yes.
Q. He was? Do you know that for a fact?
A. Yes.
Q. And how, would you tell us how you know that for a fact?
A. Cause he would hug on my mother and stuff like that.
Q. Huh?

*992 A. He would hug on my mother and try to kiss her and stuff and I was there when it happened.
Q. Did she hug and kiss him back?
A. Well, he grabbed her and started hugging on her and stuff.
.....
Q. Young lady, isn't it a fact that when your daddy came home from down there in that jail house that your mama and your daddy  he found out what was going on 
A. Yes, he did.
Q. And he told your mama and right to your face, he said, "We want you to go up there and make charges on this man and we want to do it today," and you came on up there with them and you gave statements and so forth, and statements that they talked to you about making before you went up there, didn't you?
A. Yea.
On re-direct examination [Norma] testified:
Q. I'll ask it again, [Norma], if your mother was having an affair with Anthony, does that give Anthony the right to put his hands on your breast?
A. No, it doesn't.
Q. Did you give him permission?
A. No, I didn't.
Q. Did you want him to put his hands on your breast?
A. No, I didn't.
Q. Your mother didn't tell you to let Anthony put his hands on your breast?
A. No, she didn't.
Q. Your answer is no.
A. My answer is no.
Q. He just did it, didn't he?
A. Yes, he did.
Q. And you didn't want him to, did you?
A. No, I didn't.
Q. And you were 13 years old, is that right?
A. Yes, I was.
The State rested, and the court then advised Whigham that he had a right to testify but could not be compelled to testify, it was a matter for him to decide. A brief recess was requested, following which defense counsel announced to the court that "the defendant doesn't think he should testify."
Wesley Whigham was the first defense witness. He testified that one day he was over at the Bounds house to "see the kids," and while he was standing outside he looked in a window of a room where Anthony was sleeping. He saw Norma run through the door and jump on top of him. Then, he and Phyllis "hollered at her to get out of there and leave him alone."
Larry Bounds, Whigham's stepfather, testified that Anthony and Norma "horsed" and "played" around in the Bounds house. He said that she would jump on Anthony when was in bed trying to sleep. He took it that they were just "horsing" around, that Anthony had "played with all the kids from the smallest one all the way up to [Stewart], they've always horsed around, you know."
Phyllis was the final defense witness. She testified that Norma did not live at home while her father was in prison until about two weeks before he returned. She lived at the home of Sandora Thompson, "an old man that they just know."
The jury found Whigham guilty and he was sentenced to eight years imprisonment.

LAW

I. SUFFICIENCY OF THE EVIDENCE
As to the sufficiency of the evidence, it is undisputed that Whigham, a 23-year-old man, was on top of this child with one hand holding her hands behind her head and the other under her blouse rubbing her breast, and that she was crying. We can only conjecture what would have next happened if Stanley had not come into the room. Whigham offered no explanation.
*993 There was ample evidence for the jury to conclude that in engaging in these acts, Whigham was fulfilling some sexual drive.

II. EXCLUDING EVIDENCE OF THREATS
Stanley Pratt, the father of the child victim, never testified.
During his cross-examination of Stewart Pratt, defense counsel never asked Stewart if he was afraid of his father, never asked him about any conversation he had had with Phyllis Bounds, never asked him about any threats he had ever heard his father make.
During his examination of Phyllis, a defense witness, defense counsel sought to bring out a conversation between Phyllis and Stewart after Stanley had got out of prison.
Q. Did he come  over at John's Car Care, did you have a conversation with [Stewart]?
A. I did.
Q. And what was the extent of that conversation?
BY HON. TRACY KLEIN (for the State):
Objection.
BY THE COURT:
With who now, with [Stewart]?
A. With [Stewart] the day the charges was [sic] filed.
BY THE COURT:
If it was with [Stewart], I will sustain.
Q. I'll ask this, did [Stewart] say anything about what his father wanted him to do?
A. Yes, he said he wanted 
BY HON. TRACY KLEIN:
Objection, hearsay.
BY THE COURT:
I sustain as to hearsay. You are still talking about what [Stewart] told you, is that right?
A. [Stewart], yes sir.
Q. I'll ask you whether or not [Stewart] was afraid of his father?
A. He told me he was.
BY HON. TRACY KLEIN:
Objection as to hearsay.
BY HON. KARL KEPPER (for defendant):
She can testify whether or not he told her he was afraid of him or not.
BY THE COURT:
Well, she could have answered the question without it being hearsay. But I am going to sustain.
Q. Now what did he say?
BY HON. TRACY KLEIN:
Objection, call for a hearsay answer.
BY HON. KARL KEPPER:
All right.
BY THE COURT:
Sustained.
Whigham complains of the circuit judge's excluding the testimony of Phyllis as to what Stewart, her nephew, had told her. Yet when Stewart was on the witness stand as a State witness, defense counsel never laid any kind of predicate for such hearsay testimony to be admitted. Counsel never asked Stewart if he had made any statements to Phyllis or anybody else contrary to his testimony, never asked him if his father, Stanley, had told him what, if anything, to say in court, had threatened him, or if he, Stewart, had made pretrial statements out of court to this effect. No error was committed in sustaining the State's objection to these questions to Phyllis.
Rule 613(b) M.R.E. provides:
(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party opponent.
Prior to the adoption of the M.R.E. January 1, 1986, the courts of this State followed The Queen's Case, 2 Br. & B. 284, 129 Eng.Rep. 976 (1820), in our requirement of the detailed foundation which had to be laid before evidence of contrary out-of-court *994 statements could be admitted. The witness had to be asked "whether or not on a specific date, at a specific place and in the presence of specific persons he made a particular statement." Harrison v. State, 534 So.2d 175, 179 (Miss. 1988); Hubbard v. State, 437 So.2d 430, 434 (Miss. 1983); Carlisle v. State, 348 So.2d 765, 766 (Miss. 1977).
As the comment to Rule 613(b) states, the foundation requirement of our pre-rules decisions was preserved, but with some modifications. There is no requirement that the witness's attention be directed to a particular time or sequence. U.S. v. Nelson, 574 F.2d 277 (La. Ct. App. 1978), cert. den. 439 U.S. 956, 99 S.Ct. 355, 58 L.Ed.2d 347 (1978); U.S. v. Bibbs, 564 F.2d 1165 (Fla.Ct.App. 1977), cert. den. 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978).[2]
As Harrison makes clear, however, before impeachment testimony will be permitted some foundation must be laid. In that case the State sought to impeach a witness, Ray Patty, as to prior statements he had made to Coleman, a police officer:
... M.R.E. 613(b) was complied with in that the witness Ray Patty was given an opportunity to explain or deny his statements, and Patty was available for interrogation by opposing counsel. Officer Coleman was likewise available by counsel for the defendant.
Harrison, 534 So.2d at 179.
If counsel for a party desires to impeach the testimony of a witness with some pretrial, out-of-court statement that is inconsistent with his trial testimony, it is only fair that the witness, while he is on the stand, be asked about it, and be given an opportunity to explain or deny it. Nor does this create any difficulty to counsel.
It is manifestly unfair, after the witness has been excused, to attempt to offer a pretrial inconsistent statement of the witness into evidence, and no trial court should be faulted for excluding such hearsay testimony in the absence of laying any foundation. In this case counsel surely knew prior to trial about the statements Stewart allegedly made to Phyllis. Yet he did not ask Stewart a single question about any of them.
There may be instances in which a pretrial inconsistent statement of a witness will not be known until after the witness has left the stand. In such an instance a trial judge in the interest of justice may permit the introduction of such statement, but only after making sure that the witness is available for recall and is given an opportunity to explain or deny the statement. Even here, however, it would be better procedure to permit the witness to be recalled for further examination and asked about the statement, and given an opportunity to explain or deny it, rather than introducing the statement and then recalling the witness.
We make these extended observations about the rather plain provisions of Rule 613(b) because of our recent decision, Marcum v. Mississippi Valley Gas Co., 587 So.2d 223 (Miss. 1991), in which we held it was reversible error for a circuit court to exclude a pretrial inconsistent statement of a witness for which no foundation had been laid while the witness was on the stand. We adhere to our holding in Marcum that there may be instances, as above noted, in which a trial court in the interest of justice has the discretion of admitting a pretrial inconsistent statement of a witness into evidence for which no predicate was laid of the witness, but only after the court has seen to it that the witness is available for recall and is given an opportunity to deny. Marcum, however, is overruled insofar as it is contrary to our holding today.
Because no foundation was laid for the introduction of any pretrial statements of Stewart, the court made no error in excluding any testimony of Phyllis Bounds as to any such statement.
There is an additional reason why the circuit judge did not err in excluding *995 questions to Phyllis about pretrial statements of Stewart: There was no profert made by counsel as to what Phyllis would testify, if permitted to do so. Rule 103(a)(2) M.R.E.; Tigner v. State, 478 So.2d 293 (Miss. 1985); Hammond v. Grissom, 470 So.2d 1049 (Miss. 1985).

III. CLOSING ARGUMENT
Counsel for the first time on appeal complains that the closing argument of the State commented upon Whigham's failure to testify. It is, of course, incumbent upon counsel at trial to make a contemporary objection to improper argument, and also in his motion for a new trial, failing in which the error is waived. Dennis v. State, 555 So.2d 679 (Miss. 1989); Denaway v. State, 551 So.2d 162 (Miss. 1989); Johnson v. State, 416 So.2d 679 (Miss. 1982); Watts v. State, 492 So.2d 1281, 1291 (Miss. 1986); Pool v. State, 483 So.2d 331, 336 (Miss. 1986); see generally 4 C.J.S., Appeal and Error, § 352, § 372.
A trial error, however, involving violation of a Constitutional right may reach such serious dimension, however, that this Court is required to address it, though first raised on appeal. Brooks v. State, 209 Miss. 150, 46 So.2d 94, 97 (1950).
Courts in this nation have also consistently held that the Fifth Amendment right not to be compelled to be a witness against oneself, incorporated as well in Art. 3, § 26 of the Mississippi Constitution, includes the right not to have the prosecution make any comment upon a defendant's exercise of that right. The right would be eviscerated if the government were free to make invidious reference when an accused chose not to testify.
The prosecution is always free to discuss at length the testimony of the State's witnesses and why they are credible. The defendant's failure to testify does not diminish this latitude. Yet, when the defendant is the only person who can rebut the testimony of a State witness, the prosecuting attorney is not free in his argument to also inform the jury that if what the State's witness said was not true, the defendant would, or could have taken the stand and denied it. Because for obvious reason the prosecution cannot make such statement directly, it follows that the prosecution is equally prohibited from doing so indirectly or by implication. While the jury, in evaluating all the evidence in the case, may make such a deduction, if it does it must have been entirely on its own, unassisted by any affirmative comment whatsoever from the State. Monroe v. State, 515 So.2d 860 (Miss. 1987); Griffin v. State, 504 So.2d 186 (Miss. 1987); West v. State, 485 So.2d 681 (Miss. 1985).
In this case Whigham was indicted for sexual molestation of Norma Pratt. There were three eyewitnesses to this assault: Norma, the victim; her brother, Stewart; and Whigham. The prosecution knew this, the jury knew it. The only living person capable of denying the positive testimony of Norma and Stewart that Whigham sexually assaulted her was Whigham.
Yet three times in final argument, twice in opening and once in closing, the prosecuting attorneys commented upon Whigham's failure to testify. In opening argument, the prosecution made the following comments:
Secondly, you've heard very important testimony from Randall Overstreet, the young man 17 years of age, had clear recollection of what occurred back in December, 1986. It has been unopposed here today. What he has testified to has been unimpeached, there has been no testimony with regard to his unreliability, there has been nothing from this witness stand that can in any way affect the credibility or the truthfulness of that young man's testimony
Later on the assistant district attorney continued:
I would say to you that you've heard, on behalf of the State, three witnesses, unimpeached, there's been nothing  no evidence whatsoever, toward their unreliability or their inability to tell the truth.
It obviously did not occur to defense counsel that the above was improper argument because he silently sat there and said *996 nothing. Apparently to answer the prosecution in his argument, defense counsel informed the jury as to Whigham that, "When the indictment was read to him he was charged, at that time he pled not guilty, and that's as far as he has to make a statement one way or the other, guilty or not guilty. And his was not guilty." Had defense counsel made this statement other than in answer to the opening argument of the State, the State might have a plausible contention that he invited the closing remarks which followed, but this statement no doubt was made in response to the highly improper comments in opening argument.
Then, in closing the prosecution told the jury:
We didn't jump to any conclusions. We took statements from two children who have testified today and have said it before, they understand the truth, and they understand perjury, they understand what they are doing here today. We have the evidence. We submitted it to you from this witness stand, not through irrelevant photographs, irrelevant testimony as to where children live, where they don't live, whose mother goes out with whom. The fondling took place, the hand was under the blouse. It was against the child's consent. We got that  it was rebutted. It was unrebutted.
From these remarks of the State in closing argument, the jury could reach no other conclusion except the prosecuting attorneys telling them, "Look, if Norma and Stewart were not telling you the truth, Whigham would have taken this witness stand and denied it."
In this case we do not have either an isolated or ambiguous comments which might be interpreted one way or another, but four separate statements in which the jury was told that the State's witnesses' testimony was "unopposed," "unimpeached," "no evidence whatsoever toward their unreliability," and "unrebutted." We therefore hold that the errors in closing argument reached a Constitutional dimension so egregious that failure on the part of defense counsel to make proper objection either at trial or in his motion for a new trial did not waive the error. Livingston v. State, 525 So.2d 1300, 1305 (Miss. 1988). See also, Butler v. State, 608 So.2d 314 (Miss. 1992).
We accordingly reverse because of improper argument of the State.
REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., PRATHER, SULLIVAN and BANKS, JJ., concur.
PITTMAN, J., concurs in result only.
McRAE, J., dissents without written opinion.
DAN M. LEE, P.J., specially concurs with separate written opinion joined in part by McRAE, J., only as regards the MARCUM decision.
ROBERTS, J., not participating.
DAN M. LEE, Presiding Justice, specially concurring:
I concur in the majority's result, but write separately to express my concern over the apparent dicta in the majority opinion. Inasmuch as the majority goes beyond the dispositive issue of the prosecution's inappropriate remarks, to actually attempt to overrule a recent case unnecessarily, I feel compelled to present my view on how the hearsay question should have been resolved. I would acknowledge Marcum v. Mississippi Valley Gas Co., 587 So.2d 223 (Miss. 1991) as well reasoned and controlling precedent.
Whigham contends the Circuit Court erred when it ruled Whigham's mother's testimony  as to a prior inconsistent statement made by Stewart  was inadmissible hearsay. The crux of this issue is that Whigham defended, in part, on a theory that Stanley manufactured the charge of fondling and forced his children into giving false testimony because he was angry with Whigham over the apparent sexual involvement with his wife.
*997 During cross-examination, Whigham's attorney asked Stewart, "[A]s a result of that [the relationship between Whigham and Fiona] did your daddy [Stanley] make any statements to you with reference to what he was going to do to this fellow here?" Stewart replied, "[N]o he didn't." Later in the trial, Whigham's attorney called Whigham's mother to testify and asked her on direct examination, "[D]id Stewart say anything about what his father wanted him to do?" The trial court sustained a hearsay objection to this testimony.
Under MRE 801(c), an out-of-court statement offered for the truth of the matter asserted is hearsay. The question asked of Whigham's mother required her to relate an out-of-court statement made by Stewart. Therefore, the Circuit Court was correct in finding that what Stewart told Whigham's mother about what his father wanted him to do was inadmissible as substantive evidence, that is it could not be used to determine whether Stewart, in fact, had been instructed by his father. See Lambert v. State, 574 So.2d 573, 578 (Miss. 1990).
It is, however, a separate question as to whether Stewart's out-of-court statement to Whigham's mother could be used to impeach Stewart's testimony that his father had not made any statement about what he was going to do to Whigham. The majority holds that Whigham's mother's testimony was properly excluded because Whigham failed to lay a foundation for the impeaching evidence. Prior to the formulation of the modern Rules of Evidence, it was necessary to lay a foundation, by specifically asking a witness whether he made the inconsistent statement, before the statement could be introduced by extrinsic evidence. Carlisle v. State, 348 So.2d 765, 766 (1977). See also Hubbard v. State, 437 So.2d 430, 434-435 (Miss. 1983)[1]. The Federal Rules of Evidence have relaxed these formal requirements, and allow the impeaching evidence to be introduced at any time during the trial, so long as the witness being impeached is provided an opportunity to either explain or deny having made the impeaching statement. Weinstein's at § 613[02]. See also, Theriot v. Bay Drilling Corp., 783 F.2d 527, 555 (5th Cir.1986).
Mississippi has adopted the federal rule on point, FRE 613, verbatim, and it provides that prior statements made by a witness may be introduced to impeach his testimony:
(a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.
(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require... . (emphasis added).
M.R.E. 613.
Additionally, the comments to this rule indicate:
[s]ubsection (b) preserves the foundation requirement in The Queen's Case with some modifications when impeachment is by extrinsic evidence. The traditional insistence that the attention of the witness be directed to the statement on cross-examination is relaxed in favor of simply providing the witness an opportunity to explain and the opposite party an opportunity to examine the statement, with no *998 specification of any particular time or sequence.
In Marcum v. Mississippi Valley Gas Co., 587 So.2d 223 (Miss. 1991), we construed the above rule in a similar light to that in the case sub judice. In Marcum, a witness gave a statement to a police officer at the scene of a traffic accident, but later at trial gave testimony that could have been viewed as contradicting her previous statement. Marcum failed to cross-examine the witness specifically upon her statement to the police, but later sought to call the police officer to whom the statement was given. The trial court ruled that the police officer's testimony was inadmissible hearsay. We reversed and held that the failure to specifically cross-examine a witness concerning a prior inconsistent statement  and thereby lay a foundation  did not render extrinsic evidence of the statement inadmissible. Id. at 227. Therefore, under Marcum, the formal requirement of laying a foundation on cross-examination was held no longer applicable, so long as the witness being impeached is given an opportunity at some time during the proceedings to admit, deny, or explain his inconsistent statement. Today the majority overrules Marcum and the pendulum swings back toward more formalism in evidentiary rules.
This Court's vacillation on such a technical point of law is very troubling. While it is healthy for a court to re-analyze its position on such matters in order to formulate the wisest possible rule, it seems unreasonable and incorrect to retreat to such a highly criticized and formalistic position, given the purpose of the Mississippi Rules of Evidence[2].
I see no need for superimposing a sequence requirement onto M.R.E. 613. Instead, if the facts required resolution of this issue (which they clearly do not in this case), I would hold that the Circuit Court erred in finding that the extrinsic evidence of a prior inconsistent statement was inadmissible hearsay.
Again, for the reasons stated, I concur in the judgment that Whigham is entitled to a new trial.
McRAE, J., concurs in part with this opinion as regards the MARCUM Decision only.
NOTES
[1] The name of the child victim and her immediate family members have been changed to protect her identity.
[2] See, however, Jordan v. State, 513 So.2d 574, 582 (Miss. 1987), where we continued to follow the rule of The Queen's Case.
[1] Weinstein's Evidence, in commenting upon this traditional rule which emanated from The Queen's Case, 2 Br. & B. 284, 129 Eng.Rep. 976 (1820), states:

[A]nother example of an evidentiary rule imported from England which lingered to cause problems in American jurisdictions long after it was abolished in its country of origin. Characterized by Wigmore as "the most notable mistake that can be found among the rulings upon the present subject," and considered by McCormick "a hidden rock" of which "the generality of judges and practitioners are unaware." ...
J. Weinstein & M. Berger, Weinstein's Evidence § 613[03] (1991) (footnotes omitted).
[2] "[the] promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." M.R.E. 102.