734 So.2d 276 (1999)
Dorothy Easterly TOCHE, Appellant,
v.
Larry H. KILLEBREW, M.D., Appellee.
No. 97-CA-00582 COA.
Court of Appeals of Mississippi.
February 9, 1999.
*277 Ben F. Galloway III, Gulfport, William L. Denton, Biloxi, Attorneys for Appellant.
Harry R. Allen, Rodney D. Robinson, Gulfport, Attorneys for Appellee.
BEFORE McMILLIN, P.J., COLEMAN, and PAYNE, JJ.
McMILLIN, P.J., for the Court:
¶ 1. This is an appeal from a jury verdict rendered in favor of the defendant doctor in a medical malpractice action. Dorothy Toche, the plaintiff at trial, had filed suit against Dr. Larry Killebrew, claiming that he negligently failed to detect an existing cancerous condition in her breast at a time when the disease had every prospect of being successfully treated without substantial adverse consequences to her overall health. Instead, according to her claim, because of Dr. Killebrew's failure to detect and diagnose her condition, the cancer was, over a course of several years, permitted to advance to the point that, once detected, it required aggressive treatment that was both expensive and extremely painful, and, additionally, left her overall health in a substantially deteriorated state and her prospects of ultimate recovery from cancer greatly diminished. Toche's claim was submitted to a jury on the theory of Killebrew's negligence in his treatment of Toche and the jury returned a verdict in favor of the defendant, Dr. Killebrew. It is from the judgment entered in furtherance of this verdict that Toche has appealed to this Court. She raises three issues for consideration. We find them to be without merit and affirm the judgment of the trial court.

I.

Facts
¶ 2. Toche, in 1990, was under the treatment of Dr. Killebrew for a lump that had been discovered in one of her breasts. Dr. Killebrew surgically removed the lump and subsequent testing revealed that the lump was malignant. As a result, Toche continued on a regular basis to return to Dr. Killebrew for further examination and appropriate testing. Toche's medical records reflect that, during this time, there was some continued monitoring by Dr. Killebrew of other small abnormalities in Toche's breast that appeared to be calcium deposits; however, Dr. Killebrew's records indicate that there was no enlargement or other transformation of these deposits that would suggest the necessity of a biopsy procedure to investigate whether the deposits might, in fact, be cancerous.
¶ 3. In 1993, a routine mammogram of Toche's breast revealed evidence of a cancerous condition. The condition had advanced to the stage that a radical mastectomy was required. Subsequently it was discovered that Toche also had cancer present in her lymph nodes and spine, which Toche claims to have been attributable to the fact that her breast cancer was not treated until after it had progressed to the extent that it had metastasize to other areas of her body. As a result of the radical treatment undertaken in an attempt to deal with the spreading cancer, Toche has endured substantial pain and *278 suffering, incurred large expenses for the treatment, and has found her health to be permanently and adversely impaired.
¶ 4. She attributes these difficulties directly to Dr. Killebrew's negligence in failing to exercise the necessary minimum level of professional care in her post-operative treatment after the 1990 surgery. According to her theory, the cancerous condition in her breast had existed all along in the calcified deposits noted on her earliest medical records, and Dr. Killebrew's failure to more aggressively pursue an investigation of that condition permitted the cancer to progress to the point that, when it finally unmistakenly manifested itself, her condition was substantially more serious, and the indicated course of treatment was significantly different and more involved than would have been the case had the condition been detected at an earlier stage. Additionally, she claims that the failure to detect the cancer until it had progressed so far had a permanent adverse impact on the quality of her remaining life.
¶ 5. Dr. Killebrew, in his defense, claimed essentially that Toche's most recent occurrence of cancer was not the result of the ultimate manifestation of a long-undetected cancerous condition. Rather, he asserted that Toche's cancer was a different type of cancer, referred to in the record as inflammatory carcinoma. This was, according to evidence presented at trial, a cancer that follows a rapid course from its beginning until the disease manifests itself in the manner in which it did in Toche's case. According to evidence presented by the defense, the typical course of this inflammatory carcinoma is over a course of just a few months until the patient displays the symptoms which led to Toche's being diagnosed with cancer. Thus, according to Dr. Killebrew's theory of defense, he committed no malpractice in his earlier treatment because the patient, at the time, did not have the disease.
¶ 6. Alternatively, Dr. Killebrew presented evidence that, even assuming the cancerous condition had existed at some earlier stage, Dr. Killebrew had followed the proper course of treatment because Toche had presented no symptoms that indicated the necessity for more aggressive monitoring of her condition, such as a biopsy at an earlier date. Toche's expert witness had claimed that more radical testing was clearly indicated at a much earlier time based on Toche's medical history and symptomology. Thus, under this alternative theory of the defense, the actual form of cancer that Toche had was of lesser significance. The question of Dr. Killebrew's negligence depended, rather, on whether Toche presented symptoms that indicated, at an earlier time, the necessity to more aggressively test for the presence of the disease in its earlier stages.
¶ 7. It was on this conflicting view of the case that the matter was submitted to the jury and the jury resolved the matter in Dr. Killebrew's favor. Toche's appeal raises four issues which we will proceed to consider.

II.

The First Issue: An Error in the Jury Instructions
¶ 8. Toche complains of the trial court's decision to grant the defense's requested instruction D-5A, which stated:
The Court instructs the jury that if you find from the evidence that in May of 1993, the plaintiff was diagnosed as suffering inflammatory carcinoma to her left breast rather than neglected cancer and that the character of such cancer was its rapid growth, so that at the time of Dr. Killebrew's examinations in 1990, 1991 and 1992, there was no cancer in the left breast capable of being detected by Dr. Killebrew in the exercise of that degree of care and skill which a minimally competent surgeon practicing in the United States would have used under the same or similar circumstances, then in that event, it would be your *279 sworn duty to return a verdict for the defendant.
¶ 9. Toche argues that the instruction amounted to a directed verdict for the defense because, even under her theory of her case, she conceded that she ultimately presented the symptoms of one form of inflammatory cancer, which she identifies as "secondary inflammatory cancer." The error in the instruction, according to Toche, lies in its direction to the jury to return a verdict for Dr. Killebrew if it reached the determination that Toche suffered from "inflammatory carcinoma." According to Toche, the instruction was defective because it failed to differentiate between the presence of "primary inflammatory carcinoma," which would preclude the possibility of detection years in advance, and "secondary inflammatory carcinoma," which was susceptible of early detection by a biopsy at a time less aggressive testing would not reveal the presence of cancer. Toche suggests that, even if the jury concluded that Toche had suffered from the kind of inflammatory cancerous condition she claimed to have in the earlier stages of Dr. Killebrew's treatment, the instruction required a defendant's verdict because of its failure to differentiate between primary and secondary inflammatory cancer.
¶ 10. Allegedly faulty jury instructions are not to be considered in isolation. Rather, the duty of an appellate court is to review all of the jury instructions and determine whether, in their totality, the instructions properly apprized the jury of the applicable law and the proper method of applying that law to the facts as determined by the jury. Starcher v. Byrne, 687 So.2d 737, 742 (Miss.1997). So long as we conclude that the jury was fairly and adequately instructed on matters of law pertaining to the case, our obligation is to affirm.
¶ 11. The two key disputed fact issues in this case, though perhaps presenting some difficulty to the jury in resolving them, can be stated with some measure of directness, one more so than the other. The primary issue for the jury to decide was whether Toche, in fact, suffered from the kind of cancer indicated by Dr. Killebrew and his expert witnessesa form of cancer that, because of its rapid progress, simply could not have existed at the time of Dr. Killebrew's earlier encounters with Toche. Were the jury to conclude, on sharply disputed testimony, that greater weight of the credible evidence indicated this type of cancer, then it would be impossible to conclude that Dr. Killebrew was negligent in his treatment since he could not be expected to detect and treat a condition that did not exist.
¶ 12. However, in the event the jury concluded that Toche had suffered from the alternate form of the disease, as testified to by her expert, and that it had been present for several years in a form that would have been detectable and more easily and successfully treatable had a biopsy been performed, the jury was faced with a second decision affecting liability. A doctor, in treating a patient, is not a guarantor of a successful treatment. The physician's obligation under the law of professional malpractice is to bring to bear those skills and abilities that are generally possessed by "minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment, and options." Starcher, 687 So.2d at 740. The jury was given a large amount of evidence as to what observed physical conditions, taken in conjunction with the patient's known medical history, would warrant a particular level of aggressiveness in testing for the presence of disease. Toche's expert suggested that the configuration of the calcified tissue, of itself, when considered in conjunction with Toche's medical history, indicated such a significant possibility of the presence of cancer that something more than continued observation and monitoring was indicated. Dr. Killebrew *280 countered this opinion with competing probative evidence from qualified experts that Toche's condition, including the fact that continued monitoring had not indicated any significant changes in the size or configuration of the deposits, did not suggest the medical advisability of a biopsy. Thus, even though the cancer may have, in fact, been present in Toche's body, Dr. Killebrew's failure to undertake a more aggressive testing regimen was not negligent because Toche did not present any symptoms that would suggest to a minimally competent physician practicing in this area of specialty more extensive investigation was indicated.
¶ 13. Instruction D-5A was intended to inform the jury as to its duties in regard to the former element of Dr. Killebrew's defense, i.e., that if it concluded that Toche had the rapidly-appearing and rapidly-spreading inflammatory cancer, then it should find for Dr. Killebrew because the more vigorous investigation of Toche's condition that Toche says was indicated by her symptoms would have revealed nothing. The true issue, then, is whether the language of the instruction accurately informed the jury of this proposition. The essence of Toche's argument grows, not out of competing scientific principles regarding the disease of cancer, but rather out of certain differences in terminology used by Toche's expert and those experts presented by Dr. Killebrew in his defense. Both sides accepted the proposition that the case revolved around two distinct forms of the disease; one that probably existed for a longer time until it unmistakenly manifested itself with serious and readily-detectible symptoms, and one that followed a short course from inception to the manifestation of severe symptoms. Toche's expert witness suggested that, in its later stages, the more slow-growth form of cancer would cause the patient to exhibit essentially the same symptomology as a patient suffering from the second form. In his testimony, he referred to the first form of cancer as "secondary inflammatory carcinoma," to distinguish it from the other form, which he called "primary inflammatory carcinoma." Dr. Killebrew's witnesses, agreeing essentially to the same two possibilities of Toche's form of cancer, referred to the first form as "neglected breast cancer," while calling the second form "inflammatory carcinoma." Nevertheless, it is evident from the record that Toche's expert, when referring to "secondary inflammatory carcinoma," meant the same form of cancer as Dr. Killebrew's witnesses did when referring to it as "neglected breast cancer" or "untreated breast cancer."
¶ 14. Toche's argument appears to be that, by adopting the defense's terminology and declining to use the plaintiff's somewhat different terminology to define essentially the same underlying information, the jury was instructed to find for Dr. Killebrew, no matter which form of cancer it determined Toche to have had, since, applying Toche's expert witness's terminology, both forms of the disease could be considered "inflammatory" cancer.
¶ 15. We find this argument to be without merit. Based on our review of this extensive record, including opening statements by counsel, the various experts who offered expert testimony on the subject, the entirety of the instructions given to the jury, and the skillful summation of counsel for the plaintiff and the defendant, this Court is well satisfied that the jury had sufficient information to both understand the competing theories of the parties and to weigh the evidence on both sides of the question and make an intelligent and informed decision as to how it would resolve the disputed issues of fact upon which this case turned. Even during Toche's expert's testimony, Toche's attorney referred to the second type of cancer in the alternative as "secondary inflammatory or untreated or neglected cancer." Another time, he referred to it as "untreated or secondary inflammatory cancer." To conclude that a jury, having been exposed at some length to these two competing theories *281 of Toche's medical condition as presented by skilled attorneys vigorously representing their competing positions, would have interpreted Instruction D-5A as an announcement that Dr. Killebrew was entitled to prevail no matter how the jury resolved the question of the form of Toche's cancer would assume a level of obtuseness of the twelve jurors who sat in this case that this Court is unprepared to accept.
¶ 16. This was a well-tried case in which the pivotal issues were well developed for the jury. The instructions to the jury, when considered in their entirety, and counsel's arguments in summation clearly framed the issues of fact on which the case turned. The possibility that the jury improperly decided the case solely because the trial court adopted terminology in Instruction D-5A that more closely mirrored the terminology used by defense witnesses to describe the possible forms of Toche's disease instead of the competing phraseology used by Toche's expert appears so remote on this record that we decline to find it to be error.

III.

The Second Issue: Juror Impropriety During Trial
¶ 17. After the trial was concluded, it came to light that a clerical employee of defense counsel's firm had approached a member of the jury at an evening church event during the trial and inquired as to how the juror was enjoying jury service. The juror was unaware at the time that the person making the inquiry was connected to defense counsel in this manner and inquired as to how she knew of his jury service. The employee indicated that her husband had been a member of the venire, though he had subsequently been excused, and that she had been to the courthouse looking for him and had observed this juror in the courtroom. This juror testified that he then initiated a brief conversation with the woman's husband, who was also present at the church event, because of curiosity over why he had been summoned for jury duty because the juror was under the impression that the family resided in another county. It was only during this conversation that the juror learned of the association between the woman and defense counsel's law firm. Because of instructions issued by the trial court to jurors to report all contacts about the case, this juror briefly related this circumstance the next morning to a court bailiff who indicated that he would convey the information to the trial court. However, this forwarding of information was not accomplished and the matter was not brought to the trial court's attention until after the trial, when Toche's counsel raised it in a new trial motion. The trial court held a hearing on the matter at which the juror was questioned regarding the facts of the contact. The juror testified that there was no discussion of the merits of the case with either the firm employee or her husband. He was prevented from testifying as to whether learning that a member of his Bible study class was employed by the defense attorney's law firm affected his ability to impartially deliberate by a sustained Rule 606 objection. M.R.C.P. 606.
¶ 18. On appeal, Toche argues that this contact requires reversal. It is unclear from our review of the briefs exactly what theory Toche relies upon for her argument. The argument appears to be partially based on the proposition that the church affiliation between the juror and a clerical employee of defense counsel's firm, of itself, was grounds to excuse the juror for cause. Under that view, the fact that the relationship was only discovered by the juror after trial began does nothing to lessen its impact since it was known to the juror at the time he actually participated in deliberating the outcome of the case. Toche argues that, had the court official brought the matter to the trial court's attention, as the juror was entitled to presume had occurred, a mid-trial inquiry *282 would have permitted the removal of the juror and the substitution of an alternate juror. However, since this did not occur, for reasons beyond the control of the plaintiff, Toche argues that she was irremediably prejudiced by having this compromised juror deliberate the fate of her claim. The obvious flaw in this argument, in the view of this Court, is that we are not satisfied that this rather tenuous, and previously unknown, connection between this juror and a clerical employee of defense counsel's law firm would have warranted excusing the juror for cause. There is no indication in the file the juror and the employee enjoyed a particularly close affiliation. We do not conclude that common church membership between a prospective juror and an employee of an attorney's law firm, standing alone, is a legitimate basis to excuse for cause. It may be that the discovery of this relationship would cause a further inquiry into the closeness of the actual relationship, but, in this case, there is no indication that this was anything beyond an acquaintanceship that may have been friendly, but certainly was not particularly close. Matters regarding challenges of potential jurors for cause are submitted to the sound discretion of the trial court. Scott v. Ball, 595 So.2d 848, 849 (Miss.1992). It is apparent that the trial court, in this instance, did not feel that the connection between this juror and defense counsel's employee was so close as to run the risk of bias on the juror's part or to otherwise interfere with the juror's ability to fairly and impartially deliberate with his remaining jurors on the proper outcome of the litigation. Had the trial court felt otherwise, we are satisfied that he would have ordered a new trial when the matter was presented to him. We do not find this to be an abuse of the discretion given to the trial court, and we decline to interfere on this theory.
¶ 19. Toche, without specifically saying so, intimates that there was more to this contact than appears in the record. She suggests that the juror related two separate versions of the events, one to an investigator shortly after the conclusion of the trial and a slightly different version in his testimony at the post-trial hearing. In effect, what Toche was attempting to do by having the investigator testify as to the different version was impeach the juror's credibility, since that was the only evidentiary basis for introduction of the juror's extra-judicial statements to a private investigator over a hearsay objection. See M.R.E. 801(d)(1)(A). The inconsistency in the two versions involved whether the juror had seen and talked to the employee's husband on the day of jury selection, as the investigator said he was told, or whether their first contact was at the church event after jury selection, as the juror testified at trial. The fundamental problem this Court sees with the record compiled by Toche's counsel is that he failed to lay the proper predicate for the introduction of this allegedly contradictory statement. One of the essential conditions to introduction of a prior inconsistent statement for purposes of impeachment is that, first, the witness has to be confronted with the statement and permitted to either (a) admit it and be given the opportunity to explain the inconsistency or (b) deny having made such a statement. M.R.E. 613(b); Whigham v. State, 611 So.2d 988, 994 (Miss.1992). This case illustrates quite vividly the notion that this requirement is more than merely a technical rule to trip up the unwary. In the first place, we fail to understand what particular significance ought to be attached to this alleged disparity in the juror's version of events. However, had the juror been asked whether he, in fact, made such an inconsistent statement, it is quite possible that his response would have been of substantial benefit in deciding whether the statement was actually made and, if so, what level of concern that inconsistency ought to raise. By his failure to confront the juror with an allegation that the juror had given a prior inconsistent statement, Toche's counsel has denied this Court a valuable tool, in the form of the juror's *283 response, that would assist us in determining whether there was a substantial likelihood, as Toche seems to suggest, that something untoward had occurred which the juror was attempting to conceal. On the present record, we can only observe that the minor discrepancy in the two versions does nothing to suggest with the necessary certainty that we ought to upset the verdict of this jury based solely on the proposition that (a) one juror attended the same church as a secretary in defense counsel's law firm, and (b) that secretary made an innocuous inquiry at an evening church function during the course of the trial as to how the juror viewed the experience of jury duty. To suggest that this contact was an intentional effort to accomplish some devious end is a proposition that finds no support in this record. To argue, alternatively, that the contact, though objectively innocent, nevertheless had the unintended effect of stripping this juror of his impartiality is likewise a notion lacking any merit.

IV.

The Third Issue: Impeaching Defendant's Expert Witness
¶ 20. Drs. Spell and Thigpen testified as expert witnesses for Dr. Killebrew's defense. Toche's counsel sought permission to elicit during cross-examination that the two doctors both had their medical malpractice insurance coverage through the same company as Dr. Killebrew and that the company operated as a mutual insurance company. The purpose of such evidence, according to Toche's counsel, was to demonstrate possible bias on Thigpen's and Spell's part because, if the jury returned a plaintiffs verdict, Thigpen and Spell could reasonably expect an increase in their own premiums.
¶ 21. The trial court, in considering the value of this evidence pursuant to Dr. Killebrew's motion in limine to exclude any such inquiry, determined that any bias that arguably might be demonstrated by this evidence was substantially outweighed by the potential prejudice of injecting the issue of the presence of liability insurance into the trial. See M.R.E. 403. The trial court is vested with substantial discretion in determining the admissibility of evidence. Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc., 716 So.2d 200(¶ 36) (Miss.1998). There is a long-standing principle of law in this State that gratuitously informing the jury, or even intimating to the jury, that any verdict returned by them will be satisfied by the defendant's liability insurance provider so interferes with the jury's ability to fairly deliberate the true issues of the case as to constitute reversible error. Snowden v. Skipper, 230 Miss. 684, 696, 93 So.2d 834, 839 (1957); Odom v. Walker, 193 Miss. 862, 871-72, 11 So.2d 452, 455 (1943); Herrin v. Daly, 80 Miss. 340, 342, 31 So. 790, 791 (1902). The Mississippi Rules of Evidence specifically prohibit such evidence if its sole purpose relates to the question of the negligent or otherwise wrongful conduct of the defendant. M.R.E. 411.
¶ 22. In view of the well-established policy of this State against interjecting such information in the trial without legitimate purpose other than as an attempt to color the juror's view of the case, we conclude that this policy ought to weigh heavily against admitting such evidence under Rule 403 even though some alternate basis for admitting it might have some arguable legal basis. Thus, in this case, Toche's counsel showed only the commonality of the insurance provider between Dr. Killebrew and his witnesses, and then made an essentially conclusory argument that a plaintiffs verdict would adversely affect the witnesses' future premiums. There was no showing as to the size of the company in terms of assets and loss reserves, and no projection as to what effect a large verdict might reasonably have on future premium calculations. The mere fact that the company was organized as a mutual *284 insurance company, standing alone, does little to suggest that an adverse verdict would have a substantial direct adverse financial impact on the company's insureds. Many of the largest liability insurance providers are organized as mutual companies, but there is no reasonable basis to assume, in the absence of proof, that companies so organized are more subject to volatile fluctuations in premiums based on losses than are stock companies. Anticipated future losses are one of the essential calculations that go into a company's rate structure. It would be ludicrous to assume that any insurance provider would base its rate structure on the assumption that it would never have to pay a claim on behalf of any of its insureds. It could well be that, as the result of some catastrophic and unanticipated occurrence, the magnitude of some particular claim could be so large as to threaten the existence of the company absent some drastic restructuring of its premium rates. In such case, there might be a legitimate issue as to whether a witness might be biased to some degree in testifying in the proceeding to determine the validity of that claim, so that denying the jury that information would be an abuse of the trial judge's wide discretion. That would be a matter of proof, however, and not a matter for speculation. There is no indication that Toche's claim fit into such a category.
¶ 23. To adopt a rule permitting introduction of the existence of liability insurance in this case based solely on an assertion that the witness and the defendant had the same liability carrier would permit introduction of the existence of liability insurance in a motor vehicle accident case on the happenstance that some third party eyewitness to the accident had his vehicle liability policy with the same company as the defendant. We decline to adopt such a broad rule of evidence regarding the impeachment of witnesses on the basis of their purported bias in favor of the defendant.
¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES, C.J., COLEMAN, DIAZ, KING, PAYNE, and SOUTHWICK, JJ., CONCUR.
THOMAS, P.J., IRVING and LEE, JJ., NOT PARTICIPATING.