997 So.2d 925 (2007)
Felicia WELLS and Reginald Wells, Appellants
v.
James (Marty) TUCKER, M.D., Individually and in the Scope of His Employment and/or Agency for Jackson Healthcare for Women, P.A., Appellee.
No. 2006-CA-00385-COA.
Court of Appeals of Mississippi.
September 4, 2007.
Rehearing Denied January 29, 2008.
*926 Darryl Moses Gibbs, Rogen K. Chhabra, Jonathan C. Tabor, Jackson, attorneys for appellants.
Shelly G. Burns, Jackson, Whitman B. Johnson, attorneys for appellee.
EN BANC.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. This is an appeal of a medical malpractice case in which a jury rendered a verdict for the defendant physician. Felicia and Reginald Wells sued Dr. James Tucker and alleged that Dr. Tucker negligently caused a perforation of Felicia's bowels during a C-section delivery. Dr. Tucker denied liability.
¶ 2. After Dr. Tucker designated his expert witnesses, the Wells filed a motion in limine and sought to preclude Dr. Tucker's experts from testifying. The Wells reasoned that Dr. Tucker's experts should not be allowed to testify because, along with Dr. Tucker, they were members of a nonprofit medical liability insurance corporation known as Medical Assurance Company of Mississippi (MACM). Alternatively, the Wells sought to cross-examine Dr. Tucker's experts regarding their commonality of coverage. The circuit court allowed Dr. Tucker's experts to testify and did not allow the Wells to cross-examine Dr. Tucker's experts regarding their commonality of coverage.
¶ 3. At trial, the Wells renewed their attempt to cross-examine Dr. Tucker's experts as to bias or prejudice arising from their commonality of coverage. According to the Wells, Dr. Tucker's experts were biased in favor of Dr. Tucker because he was a fellow member of MACM. However, Dr. Tucker objected and the circuit court sustained his objection. Ultimately, the jury returned a verdict for Dr. Tucker.
¶ 4. Aggrieved, the Wells appeal and claim the circuit court erred when it failed to allow cross-examination of Dr. Tucker's experts to demonstrate bias. Upon careful consideration, for reasons that will become abundantly clear, we conclude that the circuit court erred when it did not permit the Wells' cross-examination of Dr. Tucker's experts regarding the fact that they share a common insurance carrier. As such, we reverse the verdict of the jury and remand this matter for a new trial.

FACTS
¶ 5. This case was set into motion by events stemming from Felicia Wells's pregnancy. On Sunday, February 6, 2000, Felicia began having contractions. Felicia went to the Woman's Hospital  otherwise known as Jackson Healthcare for Women. Dr. James Tucker, an obstetrician gynecologist, was on call at that time. Dr. Tucker noted that the baby's heart rate was dropping. As such, Dr. Tucker and Dr. Charles Bush performed a Cesarean section delivery of Felicia's daughter, Amari.
¶ 6. Between the following Monday and Saturday, February 12th, Felicia experienced pain and bloating in her abdomen. According to Felicia, her doctors told her that she was experiencing normal post-Cesarean pains. Sometime during the following Friday night or early Saturday morning, Felicia had an unusual bowel movement. Without being graphic, Felicia lost control of her bowels. The next morning, Felicia was put on a clear liquid diet. After she tried to drink some broth and some Sprite, Felicia felt a sharp severe burning sensation in the "upper part of [her] abdomen."
¶ 7. Felicia soon underwent a CT scan at River Oaks Hospital. According to Felicia, her mother told her "that they found a *927 little hole." Felicia would later testify that no physician ever approached her and explained her condition. Soon after the discovery of the "little hole," Dr. Walter Jones performed surgery on Felicia. When Felicia woke up, she realized that she had a colostomy bag.
¶ 8. After a nine or ten day stay at River Oaks, Dr. Jones transferred Felicia to St. Dominic's Hospital so that she could be under the care of Dr. Hal Flowers, an infection control doctor. Felicia was finally discharged on February 23, 2000. During her time in treatment, she did not see Amari. On May 16, 2000, Felicia went back to St. Dominic's and had her colostomy reversed. In early June of 2000, Felicia returned to her home with Reginald and Amari.

PROCEDURAL HISTORY
¶ 9. On January 29, 2002, the Wells filed a complaint in the Rankin County Circuit Court against Dr. Tucker and various other entities. Dr. Tucker denied liability. The parties conducted discovery and designated their experts. On September 26, 2003, Dr. Tucker designated three potential expert witnesses: Dr. Paul Rice, Dr. John Morrison, and Dr. Edward Rigdon. Additionally, Dr. Tucker reserved the right to call Dr. Kim Nichols and Dr. Charles Bush. Dr. Nichols and Dr. Bush both practiced with Dr. Tucker. Finally, Dr. Tucker reserved the right to testify as to his own expert opinion.
¶ 10. The central issue in this case on appeal involves the fact that Dr. Tucker and some, if not all of his experts, all were members of, and had their medical malpractice liability policies through, the same company  Medical Assurance Company of Mississippi (MACM). MACM, a nonprofit corporation, is a limited pool of Mississippi physicians who are self-insured for protection against medical negligence suits.[1]
¶ 11. On November 10, 2003, the Wells filed a combined motion in limine and a motion to strike Dr. Tucker's experts. The Wells sought to strike Dr. Tucker's experts as cumulative and biased. According to the Wells, the circuit court should preclude their testimony as inherently biased. Alternatively, and most pertinent to our present purposes, the Wells sought to cross-examine Dr. Tucker's experts to demonstrate their commonality of coverage, thereby demonstrating bias via their direct personal financial interests in the outcome. The Wells specifically noted that "MACM insureds are shareholders in MACM and all carry `equity' accounts. The equity accounts are basically retirement accounts that prosper and grow as premiums increase and payouts decrease."
¶ 12. Dr. Tucker responded to the Wells' motion in limine and argued that the circuit court should not preclude him from calling his designated expert witnesses. Dr. Tucker also argued that the circuit court should not allow the Wells to cross-examine his experts regarding the fact that they share a common insurance carrier. Dr. Tucker attached the affidavit of Michael Houpt, the chief executive officer of MACM, as an exhibit to his response. According to Houpt's affidavit:
5. [MACM] is a non-profit corporation organized pursuant to Miss.Code Ann. Section 83-47-1, et seq. and has no shareholders. Physicians insured by [MACM] are merely members of the company.
6. According to the Bylaws of [MACM], the annual net profit or loss, *928 as the case may be, of [MACM] is allocated among the physicians who are insured by [MACM] (the "equity accounts"). Such allocation is only "on paper" because no assets of [MACM] are actually segregated or transferred into separate accounts.
7. The physicians have no vested interest in the amounts represented by the equity accounts. Each physician insured by [MACM] has only a contingent right to receive the amount represented by the physician's equity account. The physician can receive said amount only if the physician dies, becomes permanently disabled or retires while insured by [MACM]. Except for such death, disability or retirement, a physician loses the amount represented by the physician's equity account upon termination, cancellation or other non-renewal of the physician's insurance coverage with [MACM].
8. The equity account does not earn interest and cannot be encumbered, transferred or assigned by the physician. [MACM's] liability for payment of the amounts represented by the equity accounts is subordinate to the general creditors of [MACM]. The equity accounts are not retirement accounts.
9. There are presently 2,424 physicians eligible to receive allocation to their equity accounts for 2003; after consideration of applicable reinsurance, the maximum indemnity retained by [MACM] on this claim against Dr. Tucker is $500,000; and the allocation to the equity accounts is based upon after-tax profits of [MACM]. In the event Plaintiffs receive a verdict for damages against Dr. Tucker in the above styled and numbered action, the maximum amount by which any physician's equity account balance can be affected is only $136.00.

¶ 13. On December 15, 2003, the circuit court issued its order and resolved the Wells' motion in limine. The circuit court overruled the Wells' request to strike Dr. Tucker's experts. As for the Wells' request to cross-examine Dr. Tucker's experts to demonstrate bias through a commonality of coverage, the circuit court found, "under Rule 403, any probative value that may flow from the examination of the witness in this area is far outweighed by the prejudice that would result from the admission of the insurance issue before the jury." Accordingly, the circuit court refused to allow cross-examination of Dr. Tucker's experts on the subject of their commonality of coverage.
¶ 14. On November 7, 2005, the Wells filed "consolidated motions in limine and renewal of previous motion in limine and motion to strike." Among other things, the Wells renewed their request that they be allowed to cross-examine Dr. Tucker's experts to show that, like Dr. Tucker, they had medical professional liability policies with MACM and, as a result, they were biased in favor of Dr. Tucker due to their direct personal financial interest in the outcome of the litigation.
¶ 15. The parties went to trial on November 8, 2005. Before jury selection, counsel for the Wells brought to the circuit court's attention that the Wells had renewed their request to cross-examine Dr. Tucker's experts regarding their commonality of coverage. At that point, the following exchange transpired:
THE COURT: I understand. And you are not waiving your argument, and I'm reserving ruling for whenever you make this argument during the course of trial should you feel it becomes necessary. And then relative to the MACM issue, Mr. Johnson?

*929 MR. JOHNSON [counsel for Dr. Tucker]: You had already ruled on, Judge.
THE COURT: Have I?
MR. JOHNSON: Yes sir, and overruled their motions under the case of [Toche v. Killebrew, 734 So.2d 276 (Miss.Ct.App.1999)], I believe; and having overruled it, if you grant it now, then I've got [to] ask for a continuance because you've just gotten rid of all my experts.
THE COURT: Well, I thought I saw that order in there.
MR. JOHNSON: Yes, sir, I have a copy.
THE COURT: I guess I should just rely on my previous correct ruling.
MR. GIBBS [counsel for the Wells]: If I may, I know you were talking about striking the experts. I know you've rendered on that, your Honor. Will you allow cross[-]examination into their monetary interest within MACM, as supported by the affidavit filed by Mr. Johnson in response to my motion? It shows a potential interest, which I think it's distinguished from [Toche ], which only dealt with a common carrier. In this situation, the MACM insurers have equity handles, and that's the only issue, if I can be allowed cross[-]examination at that point.
MR. JOHNSON: And again, you've already ruled on that. And if you're now going to let him go into it, then I'm in a position of having a ruling taken away from me where I would have done something different. Additionally, Judge, if I remember right, and I don't have it here, I'm looking at the order. The court found that the financial aspect under 403, any probative value is outweighed by the prejudice. And financial orders are refrained from raising that issue. And if I recall correctly, Judge, the hourly rate of each of these experts, the hourly rate, the per hour rate of each of these experts is greater than any potential impact.
THE COURT: I don't remember that issue specifically but if I've already ruled on it, I don't feel like I need to reverse myself. It doesn't sound like that there's anything more before me that than was before me earlier.
¶ 16. After jury selection, the Wells began their case-in-chief. Felicia testified first. Reginald followed. After Reginald testified, counsel for Dr. Tucker argued that the Wells had opened the door on the collateral source rule.[2] That is, Dr. Tucker's lawyer claimed that, based on testimony that the Wells could not bear the financial burden of Felicia's medical bills, he should be permitted to introduce evidence that health insurance satisfied portions of the Wells' obligations. Counsel for the Wells disagreed. Further, counsel for the Wells suggested that, should the circuit court find that the door was opened regarding the collateral source rule, the circuit court should permit cross-examination of Dr. Tucker's experts to demonstrate their inherent bias due to commonality of coverage.
¶ 17. The circuit court stated:
[L]isten, counsel, let me tell you something. We're just all kidding ourselves. This jury knows all about insurance. *930 They know that this plaintiff probably had medical coverage through her place of employment that has covered at least a portion of the medical bills, and maybe through Mr. Wells' employment. I'll tell you, this is a whole bunch of to-do about nothing. There's not a person on that jury that doesn't know about insurance coverage. But I'm going to leave it like it is.
Shortly afterwards, the circuit court added:
But I really do think y'all are headed down  you know, this is a red herring. It's a path that's going to cause more trouble than it's worth. There's not a person on that jury that doesn't know that there's insurance coverage involved on both sides.
Accordingly, the Wells were never permitted to impeach Dr. Tucker's experts by demonstrating that, due to their commonality of coverage, they had a direct interest in a verdict for Dr. Tucker. The jury returned a verdict for Dr. Tucker. On November 14, 2005, the circuit court entered its final judgment. Following unsuccessful post-trial motions, the Wells appeal.

STANDARD OF REVIEW
¶ 18. We must review a circuit court's decision to exclude evidence pursuant to our familiar abuse of discretion standard of review. Burton v. State, 875 So.2d 1120 (¶ 6) (Miss.Ct.App.2004). "The trial court is vested with substantial discretion in determining the admissibility of evidence." Toche v. Killebrew, 734 So.2d 276, 283 (¶ 21) (Miss.Ct.App.1999). We will reverse the circuit court if we find an abuse of that discretion that resulted in prejudice to a party. Walker v. Benz, 914 So.2d 1262, 1267(¶ 17) (Miss.Ct.App.2005).

ANALYSIS

I. DID THE CIRCUIT COURT ERR WHEN IT PROHIBITED CROSS-EXAMINATION OF DR. TUCKER'S EXPERTS REGARDING THEIR COMMONALITY OF MEDICAL MALPRACTICE LIABILITY INSURANCE?
¶ 19. As mentioned, the Wells sought to impeach the credibility of Dr. Tucker's experts by demonstrating that, because Dr. Tucker and his physician experts were covered by the same mutual insurance company, Dr. Tucker's experts were biased in favor of Dr. Tucker because they had a direct personal financial interest in the outcome of the case. Dr. Tucker objected and reasoned that the Wells should not be permitted to impeach his experts because that line of cross-examination would necessarily expose the jury to the presence of liability insurance in violation of the provisions of M.R.E. 411. The circuit court agreed. As such, the circuit court sustained Dr. Tucker's objection and precluded the Wells from impeaching Dr. Tucker's experts by demonstrating a commonality of insurance coverage. The Wells claim the circuit court erred.
¶ 20. Fundamentally, we must balance two seemingly opposing rules of evidence. The Wells sought to cross-examine Dr. Tucker's experts to demonstrate bias through a personal financial interest. M.R.E. 616 provides that, "evidence of bias, prejudice or interest of the witness for or against any party to the case is admissible" to attack a witness' credibility. Furthermore, "the right of confrontation and cross-examination ... extends to and includes the right to fully cross examine the witness on every material point relating to the issue to be determined that would have bearing on the credibility of the witness and the weight and worth of his testimony." Smith v. State, 733 So.2d *931 793, 802(¶ 41) (Miss.1999). Succinctly put, the Wells submit that M.R.E. Rule 616 permits their liberal cross-examination of Dr. Rice's and Dr. Morrison's status as members of MACM to show that they were biased in favor of Dr. Tucker  also a member of MACM.
¶ 21. However, if the Wells were allowed to impeach Dr. Tucker's experts as they intended, that would have the simultaneous effect of announcing that Dr. Tucker had liability insurance. Dr. Tucker's basic argument is that the Wells' clandestine motive was to put forth to the jury that Dr. Tucker had insurance against any liability he would incur for negligence in the performance of Felicia's C-section. As such, M.R.E. 411 comes into play. Pursuant to M.R.E. 411:
Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.
(emphasis added).
¶ 22. There can be no doubt that evidence of liability insurance is not strictly or rigidly prohibited. According to M.R.E. Rule 411, it may be admitted if offered for another purpose. One of those contemplated purposes is the demonstration of bias or prejudice. To resolve this issue, we must conduct a balancing test. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403. "M.R.E. 403 is the ultimate filter through which all evidentiary objections eventually flow." Walker, 914 So.2d at 1270 (¶ 33).
¶ 23. This Court considered a related issue in Toche, 734 So.2d at 276. In Toche, a medical malpractice case, a plaintiff unsuccessfully attempted to cross-examine a defendant physician's expert witnesses regarding the fact that they all had malpractice liability policies through the same mutual insurance company. Id. at (¶ 20). The plaintiff submitted that the experts were biased in that their premiums would increase if the jury returned a verdict for the plaintiff. The circuit court held that the prejudice of injecting the issue of liability insurance substantially outweighed the probative value of the evidence of bias. Id. at (¶ 21).
¶ 24. This Court affirmed the circuit court's decision. In so doing, this Court noted (a) the plaintiff merely demonstrated a commonality of insurance coverage and concluded that a verdict would affect the experts' premiums, (b) the plaintiff did not demonstrate "the size of the company in terms of assets and loss reserves," and (c) the plaintiff offered "no projection as to what effect a large verdict might reasonably have on future premium calculations." Id. at (¶ 22).
¶ 25. Though we did not discuss it in Toche, other jurisdictions have considered similar issues. Most jurisdictions apply what has become characterized as a "connections test" or a "substantial connections test." "The substantial connection analysis looks to whether a witness has `a sufficient degree of "connection" with the liability insurance carrier to justify allowing proof of this relationship as a means of attacking the credibility of the witness.'" Bonser v. Shainholtz, 3 P.3d 422, 425 (Colo.2000) (quoting Otwell v. Bryant, 497 So.2d 111, 115 (Ala. 1986)).
¶ 26. In Mendoza v. Varon, 563 S.W.2d 646, 649 (Tex.Civ.App.1978), a medical *932 malpractice case, a plaintiff attempted to introduce evidence that the defendant and his expert were insured by the same insurance company. The trial court refused to allow the plaintiff to present such evidence. Id. After a jury verdict for the defendant, the Texas Court of Civil Appeals considered the issue. The Mendoza court affirmed and held:
[T]he [expert] witness had no direct interest in the outcome of the litigation, as would an agent, owner or employee of the defendant's insurer. While it is true that a large judgment against any doctor will probably affect the insurance rates of other physicians, this interest is remote, and any proof of bias based upon that interest is outweighed by the prejudice caused by informing the jury of the defendant's insurance protection.
Id.
¶ 27. The Alabama supreme court first mentioned a "connections" analysis in Otwell, 497 So.2d at 113 (Ala.1986). In Otwell, a medical malpractice case, a plaintiff attempted to introduce evidence that two defendant physicians and three of the defendants's physician expert witnesses were all members of the same mutual assurance company.[3] The trial court refused to allow the evidence before the jury. The jury ultimately returned a verdict for the defendant doctors. Id. The Alabama supreme court affirmed and held:
What is missing in the present case is the sufficient degree of "connection." The coincidental fact that the witness and the defendants are both insured by MASA is not an adequate degree of connection to counter-balance the undue prejudice that will result to the defendants through alerting the jury to the existence of liability insurance.
Id. at 114.
¶ 28. In Kelley v. Wiggins, 291 Ark. 280, 724 S.W.2d 443, 447 (1987), the Arkansas supreme court upheld a trial court's decision to allow cross-examination of a doctor defendant's expert on the subject of commonality of insurance. Specifically, counsel for the plaintiffs asked the defendant's expert whether he had insurance coverage with a certain insurance company. Id. The expert did not know. Id. Then, counsel for the plaintiffs asked the expert whether his premiums would increase if the jury returned a large judgment against a doctor. Id. Again, the expert did not know. Id.
¶ 29. According to the Arkansas supreme court, whether the expert was insured by the same company that insured the defendant was "to some degree relevant to impeachment of [the expert's] testimony." Id. The Kelley court also mentioned that the trial court could have sustained the objection on the basis that "the effect of one judgment on the company's rates was too remote and thus its prejudicial effect outweighed its probative value." Id. However, the Kelley court found that the decision was within the trial court's discretion. Id.
¶ 30. In Barsema v. Susong, 156 Ariz. 309, 751 P.2d 969, 974 (1988), the Arizona supreme court found that commonality of insurance coverage through Mutual Insurance *933 Company of Arizona (MICA) between a defendant physician and his expert, without more, was inadmissible.[4] However, Barsema also found that the trial court erred when it prevented cross-examination of an expert who was a vice president and member of MICA's board of directors who, while not salaried, was compensated for the duties he performed for MICA  one of which was to keep premiums low. Id.
¶ 31. Other jurisdictions have reached similar results where a plaintiff demonstrated, without more, that a defendant physician and his expert were insured by the same medical malpractice liability company. See Patton v. Rose, 892 S.W.2d 410, 415 (Tenn.Ct.App.1994) (plaintiff unsuccessfully sought to cross-examine one of the defendant physician's expert witness regarding the fact that the expert was insured by State Volunteer Mutual Insurance Company, the same insurance company that insured the defendants); Warren v. Jackson, 125 N.C.App. 96, 479 S.E.2d 278, 281-82 (1997) (mere policyholder status represents too attenuated a "connection" with an insurance company, mutual or otherwise, for the probative value of such evidence to outweigh the potential prejudice to the jury's deliberations); Mills v. Grotheer, 957 P.2d 540, 543 (Okla. 1998) (unless it is shown that a witness has a substantial connection with the business of the common insurer, there is no basis for discrediting a person's testimony for bias derived from interest in the common insurer's business); Reimer v. Surgical Services of the Great Plains, P.C., 258 Neb. 671, 605 N.W.2d 777, 781 (2000) (plaintiffs "presented no evidence of bias other than the mere fact that [the defendant] and his expert were policyholders of insurance issued by the same carrier. Absent other facts to indicate bias, the facts of the instant case indicate only a remote possibility of bias."); Hawes v. Chua, 769 A.2d 797, 810-11 (D.C.2001); Chambers v. Gwinnett Cmty Hosp., Inc., 253 Ga.App. 25, 557 S.E.2d 412, 417 (Ga.Ct.App.2001) ("[A] party must demonstrate a more substantial connection than simply a common mutual insurance carrier to overcome the potentially prejudicial effect of introducing evidence of a defendant's insurance.")
¶ 32. The Wells rely heavily on Ede v. Atrium South OB-GYN, Inc., 71 Ohio St.3d 124, 642 N.E.2d 365 (1994). In Ede, a plaintiff sued a physician and his clinic. The defendant and all of his submitted experts were insured through Physician's Mutual Insurance Company (PIE). The trial court in Ede refused to allow the plaintiff to cross-examine the defendant's experts regarding their status as members of the same mutual insurance company as the defendant. The Ohio Supreme Court reversed and found that:
Given the sophistication of our juries, the first sentence of [rule 411] does not merit the enhanced importance it has been given. Instead of juries knowing the truth about the existence and extent of coverage, they are forced to make assumptions which may have more prejudicial effect than truth. Thus, the second sentence of [rule 411], which allows courts to operate in a world free from truth-stifling legal fictions, ought to be embraced. In such instances as the case at hand, truth should win out over a naively inspired fear of prejudice.
Id. at 368. Accordingly, the Ede court adopted a per se rule that commonality of coverage is admissible to prove bias in a medical malpractice case. The Wells would have this Court adopt the reasoning in Ede. Dr. Tucker submits that, if this *934 Court adopted the reasoning in Ede, this Court would totally divest the trial court of its discretion under M.R.E. Rule 403.
¶ 33. The circuit court did not discuss its resolution of the M.R.E. 403 balancing test beyond the statement that the prejudicial effect of the evidence outweighed the probative value of bias. There can be no doubt that Dr. Tucker's MACM insured experts had some financial interest in the outcome. Houpt's affidavit demonstrated that they had at least a $136 interest, representing the amounts their equity accounts could decrease in the event of a $500,000 verdict against Dr. Tucker. According to the Wells, even if Houpt's affidavit is completely accurate, and not skewed in favor of Dr. Tucker, Houpt's affidavit still shows that Dr. Rice and Dr. Morrison had a monetary interest in the litigation against Dr. Tucker. It is also very well possible, if not certain, that the MACM experts' own premiums were calculated based on the losses or lack of losses due to settlements or adverse verdicts against MACM insureds.
¶ 34. As for an exact degree of bias, it is difficult to calculate just how probative the evidence is. It is certainly probative of bias or prejudice to some degree. It was sufficiently probative of bias that Dr. Tucker's counsel opined to the circuit court that, should the circuit court admit it, he would have to find different experts. At least by inference, counsel for Dr. Tucker admitted during oral argument that cross-examination of his experts to show commonality of coverage would have a substantial effect on their credibility. Counsel for Dr. Tucker stated:
[W]ith regard to certain specialties, they [MACM] really are the only game in town. Almost all the OB-GYNs around, certainly in the Jackson area, are ... MACM insureds. A ruling that a defendant who is insured by MACM cannot use ... another doctor who is insured by MACM is essentially going to cut him out of the vast majority of local doctors.
¶ 35. The contemplated prejudicial effect of such evidence is that, if admitted, it will taint the jury's deliberations in that the jury will be more likely to render a verdict for a plaintiff if the jury is aware that a defendant will not have to pay damages himself. However, it is difficult to understand the circuit court's logic in excluding the evidence when the circuit court explicitly stated that the jury was already aware that Dr. Tucker had medical professional liability insurance. Specifically, the circuit court said, "If you're talking about in relation to Dr. Tucker having coverage, listen, counsel, let me tell you something. We're just all kidding ourselves. This jury knows all about insurance." Perhaps the circuit court believed the jury was aware of insurance due to the much-publicized debate over tort reform. In any event, the circuit court was certainly of the opinion that the jury knew Dr. Tucker had insurance.
¶ 36. We cannot say that the comments of the circuit court were inappropriate or inaccurate. Months before this trial, Mississippi's alleged medical malpractice crisis was well-publicized. It was often front page news in the print media and covered daily by electronic media. As a matter of fact, Governor Barbour had recently, as of 2004, called the state legislature into special session to deal with the issues of the perceived medical malpractice insurance crisis and tort reform. As a consequence, the legislature passed comprehensive legislation on the subject.
¶ 37. It seems important to step back a moment and look at the forest instead of the trees. This is a complex medical negligence suit. It may be accurately described as a "war of the experts." The Wells' expert claimed Dr. Tucker breached *935 the minimum acceptable standard of care when he negligently caused a perforation of Felicia's colon during her C-section. However, Dr. Tucker's experts claimed that Felicia experienced an "ileus" and that Felicia's complications were not the result of any medical negligence. A lay jury of twelve citizens is called upon to evaluate this complex medical testimony and determine the truth to the best of their ability. The credibility of each party's medical experts is crucial in this analysis and, more often than not, outcome determinative. It is, as it should be, a grave concern when any court limits a party from appropriately testing the credibility of such medical experts by exposing any potential bias or prejudice that an expert may have in favoring one party or the other.
¶ 38. Before any court may exclude otherwise competent and relevant evidence under the ultimate filter of M.R.E. Rule 403, it must determine that the danger of unfair prejudice substantially outweighs its probative value. Smith v. State, 733 So.2d 793, 801(¶ 38) (Miss.1999). It is exceedingly difficult to conclude just how there may be any unfair prejudice to Dr. Tucker if the jury already knew or assumed he had liability insurance in this case. On the other hand, the Wells claimed that, like Dr. Tucker, every one of Dr. Tucker's experts were MACM insureds and that, as a result, Dr. Tucker's experts had a direct financial interest in the outcome of this litigation by way of monetary deduction from their equity accounts as well as an increase in their premiums. Counsel for the Wells was never permitted to cross-examine Dr. Tucker's experts on subjects such as whether any MACM member has ever testified as a plaintiff's expert for a patient against another MACM member and, if so, whether that doctor is still a MACM member. It is without dispute that such evidence is relevant and probative of potential bias and/or prejudice of the expert. Moreover, the circuit court instructs the jury that it is their sole responsibility to evaluate the credibility of each testifying witness. We conclude, under the circumstances revealed in this record, the circuit court abused its discretion in prohibiting the testimony at issue.
¶ 39. On remand, assuming the case is retried with the same issues recurring, upon request, Dr. Tucker would be entitled to a cautionary instruction to the jury. The jurors should be instructed that they should not consider any evidence of the presence of liability insurance in determining whether Dr. Tucker acted negligently or otherwise wrongfully. Instead, the jury may only consider such evidence of liability insurance as it may effect the bias or prejudice of a witness. We are not plowing new ground. We have often required, upon request, that a circuit court grant such an instruction when evidence is admissible for one legitimate purpose but not another. See, e.g., Brown v. State, 890 So.2d 901, 913 (¶ 36) (Miss.2004). For example, we have permitted evidence of other criminal acts to be admitted against an accused when offered for a specific purpose under M.R.E. 404(b) such as motive, intent, or mistake. Id. We see no logical reason to deviate between cases where an individual's life or liberty is at stake, as opposed to one where only money is at stake.
¶ 40. Considering our resolution of this issue, it is unnecessary to address the Wells' remaining issues. Suffice it to say, it is a moot question as to whether the verdict was contrary to the weight of the evidence or whether the evidence was sufficient to render a verdict for Dr. Tucker.

CONCLUSION
¶ 41. Considering the circuit court's statements, we find the circuit court *936 abused its discretion. While we do not take judicial notice that jurors are all aware in every case that physicians have professional liability insurance, the circuit court certainly thought they did, and Dr. Tucker did not challenge that line of thought. If the circuit court believed that the jury knew about the presence of insurance, then there can be no prejudicial effect in placing it before the jury. Applying the balancing test, the evidence had some probative value and, according to the circuit court's line of reasoning, there would have been no prejudice in allowing the jury to hear that Dr. Tucker had insurance.
¶ 42. We do not adopt a per se rule as the Ede court did. Instead, we simply hold that, based on the record now before us, the circuit court abused its discretion when it applied the M.R.E. 403 balancing test. Accordingly, we reverse and remand for a new trial consistent with this opinion.
¶ 43. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REVERSED AND REMANDED FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., MYERS, P.J., IRVING AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CHANDLER AND BARNES, JJ. LEE, P.J. AND CARLTON, J., NOT PARTICIPATING.
GRIFFIS, J., Dissenting:
¶ 44. I am of the opinion that the majority departs from recent precedent of this Court. Toche v. Killebrew, 734 So.2d 276, 283-84 (¶¶ 20-23) (Miss.Ct.App.1999). I find Toche to be directly on point and to govern this issue. Therefore, I respectfully dissent.
¶ 45. The majority offers a brief discussion of Toche and does not recognize it as authority for the present case. The majority deals with Toche by stating that it considered a "related issue." Majority opinion (at ¶ 23).
¶ 46. The majority introduces the issue of this appeal as follows: "the Wells sought to impeach the credibility of Dr. Tucker's experts by demonstrating that, because Dr. Tucker and his physician experts were covered by the same mutual insurance company, Dr. Tucker's experts were biased in favor of Dr. Tucker because they had a direct financial interest in the outcome of the case." Majority opinion (at ¶ 19). Thus, the question is whether the economic or financial bias of Dr. Tucker's witnesses should allow the plaintiffs an opportunity to offer impeachment evidence to show such bias. The trial judge filtered the impeachment evidence through Rule 403 of the Mississippi Rules of Evidence and determined that it should be excluded because its probative value was substantially outweighed by the danger of unfair prejudice. Similarly, in Toche, the plaintiff sought to impeach the defendant's expert witnesses. Id. at 283 (¶ 21). The plaintiff wanted to cross-examine the defendant's expert witnesses on the fact that they had a common malpractice insurance carrier. Id. The plaintiff argued that this evidence would show bias by the witnesses; specifically, the witnesses would be biased because they had a financial interest in the outcome of the case. Id.
¶ 47. Because I find Toche to be on point and determinative of this appeal, I quote this Court's discussion of this issue in its entirety.
The Third Issue: Impeaching Defendant's Expert Witness
Drs. Spell and Thigpen testified as expert witnesses for Dr. Killebrew's defense. Toche's counsel sought permission *937 to elicit during cross-examination that the two doctors both had their medical malpractice insurance coverage through the same company as Dr. Killebrew and that the company operated as a mutual insurance company. The purpose of such evidence, according to Toche's counsel, was to demonstrate possible bias on Thigpen's and Spell's part because, if the jury returned a plaintiff's verdict, Thigpen and Spell could reasonably expect an increase in their own premiums.
The trial court, in considering the value of this evidence pursuant to Dr. Killebrew's motion in limine to exclude any such inquiry, determined that any bias that arguably might be demonstrated by this evidence was substantially outweighed by the potential prejudice of injecting the issue of the presence of liability insurance into the trial. See M.R.E. 403. The trial court is vested with substantial discretion in determining the admissibility of evidence. Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc., 716 So.2d 200(¶ 36) (Miss.1998). There is a long-standing principle of law in this State that gratuitously informing the jury, or even intimating to the jury, that any verdict returned by them will be satisfied by the defendant's liability insurance provider so interferes with the jury's ability to fairly deliberate the true issues of the case as to constitute reversible error. Snowden v. Skipper, 230 Miss. 684, 696, 93 So.2d 834, 839 (1957); Odom v. Walker, 193 Miss. 862, 871-72, 11 So.2d 452, 455 (1943); Herrin v. Daly, 80 Miss. 340, 342, 31 So. 790, 791 (1902). The Mississippi Rules of Evidence specifically prohibit such evidence if its sole purpose relates to the question of the negligent or otherwise wrongful conduct of the defendant. M.R.E. 411.
In view of the well-established policy of this State against interjecting such information in the trial without legitimate purpose other than as an attempt to color the juror's view of the case, we conclude that this policy ought to weigh heavily against admitting such evidence under Rule 403 even though some alternate basis for admitting it might have some arguable legal basis. Thus, in this case, Toche's counsel showed only the commonality of the insurance provider between Dr. Killebrew and his witnesses, and then made an essentially conclusory argument that a plaintiff's verdict would adversely affect the witnesses' future premiums. There was no showing as to the size of the company in terms of assets and loss reserves, and no projection as to what effect a large verdict might reasonably have on future premium calculations. The mere fact that the company was organized as a mutual insurance company, standing alone, does little to suggest that an adverse verdict would have a substantial direct adverse financial impact on the company's insureds. Many of the largest liability insurance providers are organized as mutual companies, but there is no reasonable basis to assume, in the absence of proof, that companies so organized are more subject to volatile fluctuations in premiums based on losses than are stock companies. Anticipated future losses are one of the essential calculations that go into a company's rate structure. It would be ludicrous to assume that any insurance provider would base its rate structure on the assumption that it would never have to pay a claim on behalf of any of its insureds. It could well be that, as the result of some catastrophic and unanticipated occurrence, the magnitude of some particular claim could be so large as to threaten the existence of the company absent some drastic restructuring of its premium rates. In such case, *938 there might be a legitimate issue as to whether a witness might be biased to some degree in testifying in the proceeding to determine the validity of that claim, so that denying the jury that information would be an abuse of the trial judge's wide discretion. That would be a matter of proof, however, and not a matter for speculation. There is no indication that Toche's claim fit into such a category.
To adopt a rule permitting introduction of the existence of liability insurance in this case based solely on an assertion that the witness and the defendant had the same liability carrier would permit introduction of the existence of liability insurance in a motor vehicle accident case on the happenstance that some third party eyewitness to the accident had his vehicle liability policy with the same company as the defendant. We decline to adopt such a broad rule of evidence regarding the impeachment of witnesses on the basis of their purported bias in favor of the defendant.
Toche, 734 So.2d at 283-84 (¶¶ 20-23).
¶ 48. Toche dealt with the issue of whether evidence of a liability insurance policy may be introduced to show economic or financial bias by a defense witness. Toche answered this question in the negative. Id. Toche discussed three legal principles that are equally relevant here.
¶ 49. First, "[t]he trial court is vested with substantial discretion in determining the admissibility of evidence." Toche, 734 So.2d at 283 (¶ 21). We must determine whether the trial court abused this "substantial discretion." The majority believes the circuit judge did. I disagree. It was well within the discretion of the circuit judge to rule that such evidence should be excluded. I am of the opinion that the circuit judge correctly applied Toche.[5]
¶ 50. Second, "[t]here is a long-standing principle of law in Mississippi that gratuitously informing the jury, or even intimating to the jury, that any verdict returned by it will be satisfied by the defendant's liability insurance provider so interferes with the jury's ability to fairly deliberate the true issues of the case as to constitute reversible error."[6]Id. The majority wholly fails to consider this "long-standing principle of law in Mississippi." Id. Instead, *939 the majority relies heavily upon the rationale from an Ohio case. Ede v. Atrium South OB-GYN, Inc., 71 Ohio St.3d 124, 642 N.E.2d 365 (1994). The result is that the majority will abandon this "long-standing principle of law in Mississippi" and allow a liability insurance policy to be introduced because a witness may have a $136 economic or financial in the outcome of the case. I am not so quick to abandon this principle.
¶ 51. Third, there is a "well-established policy of this State against interjecting such information in the trial without legitimate purpose other than as an attempt to color the juror's view of the case, we conclude this policy ought to weigh heavily against admitting such evidence under Rule 403 even though some alternate basis for admitting it might have some arguable legal basis." Toche, 734 So.2d at 283 (¶ 22). Here, the "legitimate purpose" is to show that the witnesses have a $136 economic or financial interest. I am of the opinion that the only reason to offer this evidence is to interject the fact that Dr. Tucker has a liability insurance policy.
¶ 52. What troubles me with the majority's analysis of this issue is paragraph 33. The majority states that "Houpt's affidavit demonstrated that they had at least $136 interest, representing the amounts their equity accounts could decrease in the event of a $500,000 verdict against Dr. Tucker." I take issue with the use of the words "at least." The record simply does not support this statement. Houpt's affidavit stated, "[i]n the event Plaintiffs receive a verdict for damages against Dr. Tucker ... the maximum amount by which any physician's equity account balanced can be affected is only $136.00." (emphasis in original). The record only supports an economic or financial interest of $136 at the most.
¶ 53. Also, there is nothing in the record to support the statement that "MACM's experts' own premiums were calculated based on the losses or lack of losses due to settlements or adverse verdicts against MACM's insureds." This may or may not be the case. However, the record here does not support this statement and should not be considered by this Court. Likewise, there is nothing in the record to support the statement, in paragraph 38, that "Dr. Tucker's experts were MACM insureds and that, as a result, Dr. Tucker's experts had a direct financial interest in the outcome of this litigation by way of .. . an increase in their premiums." Without support for these factual findings in the record, they should not be included in our consideration.
¶ 54. The question of whether Dr. Tucker's expert witnesses may be impeached because they are biased toward Dr. Tucker because they are covered by the same mutual insurance company or because they had a direct financial interest in the outcome of the case presents a basic evidentiary analysis. Under Rule 616 of the Mississippi Rules of Evidence, "[f]or the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible." From there, we move to Rule 411:
Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.
Evidence of a liability insurance policy is not admissible to establish liability. Nevertheless, evidence of liability insurance may be admitted to establish "bias or prejudice of a witness." Id. We then move to *940 Rule 403, the ultimate filter for all evidence:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
The circuit judge determined that the probative value of the evidence that Dr. Tucker's expert witnesses may incur a financial penalty of $136 if the Wells were successful and obtained a verdict of at least $500,000 was substantially outweighed by the prejudice of the admission of the existence of a liability insurance policy.
¶ 55. I cannot find the circuit judge's decision to exclude such evidence to be an abuse of discretion. The jury had already heard evidence of economic or financial bias. The Wells' expert witness testified that he was being paid $400 per hour for his work. Dr. Tucker's experts testified that they were being paid $350 and $400 per hour for their work. Neither the Wells' nor Dr. Tucker's experts were asked about, and therefore did not testify as to, the total amount they were paid for their testimony. Counsel for neither the plaintiffs nor the defendants pressed the witnesses to explain their total financial compensation for their appearance and their testimony. All of the experts received a direct financial benefit of thousands, if not tens of thousands, of dollars for their services and their testimony. I hardly see how the testimony that Dr. Tucker's experts may receive the benefit of $136 could be considered a bias or prejudice for their testimony that would be sufficient to allow the jury to learn that Dr. Tucker had liability insurance available to pay any verdict that was rendered.
¶ 56. I am even more persuaded by what information the plaintiffs' counsel did not seek on cross-examination of Dr. Tucker's experts. As discussed above, plaintiffs' counsel did not ask Dr. Tucker's experts about the total or cumulative amount they earned by testifying. Evidence of the total amount paid could show direct and substantial financial bias. Likewise, counsel did not ask Dr. Tucker's experts about their experiences as an expert witness, i.e. number of times they testified, whether they solicited witness opportunities, whether they ever testified on behalf of a plaintiff, or whether their testimony was always on behalf of a defendant physician. Testimony on either of these subjects, which was available to plaintiffs' counsel, could have been used to show substantial bias or prejudice by Dr. Tucker's experts. The failure of plaintiffs' counsel to cross-examine Dr. Tucker's experts on these issues confirms to me that the real motivation behind the plaintiffs' efforts was to introduce evidence of the existence of a liability insurance policy. The exclusion of a very minimal financial connection between the defendant/physician and his expert witnesses was a reasonable application of the Mississippi Rules of Evidence. The interjection of liability insurance would have allowed the jury to decide this case on improper grounds.
¶ 57. In conclusion, the practical impact of the majority's decision is that, in future cases, only out-of-state experts will be available to testify as to the standard of care in medical malpractice cases in Mississippi.
¶ 58. I conclude that the circuit judge's decision was not an abuse of discretion. Because I would affirm the trial court, I must respectfully dissent.
CHANDLER AND BARNES, JJ., JOIN THIS OPINION.
NOTES
[1] "As a result of a malpractice crisis that existed in Mississippi, members of the Mississippi State Medical Association joined together in 1976 to establish [MACM]." http://www.macm.net/ad_history.htm.
[2] Felicia testified that she had incurred over one hundred thousand dollars in medical bills as a consequence of Dr. Tucker's alleged medical negligence. Mrs. Wells was employed as an ICU nurse with Central Mississippi Medical Center and Mr. Wells was employed as a forklift operator with Sysco, Inc. Presumably, the Wells' private medical insurance carriers would have had a right of subrogation as to any potential recovery against Dr. Tucker.
[3] Two defendant doctors were insured by the Mutual Assurance Society of Alabama (MASA). Two physician expert witnesses were also insured by MASA. A third physician expert witness was the president of MASA at the time of trial. That expert was also a member of the claims committee that reviewed the case. Id. "MASA was formed to provide malpractice insurance for doctors after the major malpractice carriers stopped writing policies in Alabama. The doctors who are members of the society pay money each year to the fund. Malpractice awards are paid out of this fund and MASA has paid a dividend in the past, which is just a return of part of the premiums." Id.
[4] MICA was organized in response to the alleged malpractice crisis in 1974-75, and many Arizona doctors are insured by it. Id. at 972 (footnote omitted).
[5] The majority seems to place much reliance on the circuit judge's statement that he believed the jury knew that insurance was involved in this case. While those statements may indeed be the circuit judge's opinion, the circuit judge followed the prior precedent of this Court and the Supreme Court when he decided to exclude such evidence under the Mississippi Rules of Evidence. The circuit judge's skepticism as to whether the jury could decide the case without considering insurance should not guide our decision here. Instead, it is clear that the circuit judge's skepticism did not guide his decision when he was presented the opportunity to abandon the collateral source rule, and allow the defense to introduce evidence of Ms. Wells' health insurance coverage, and to allow the admission of the defendant's liability insurance coverage. The circuit judge voiced his opinion in the record. However, the circuit judge ruled contrary to his opinion and consistent with the reported precedent of the Mississippi appellate courts.
[6] Recently, in Smith v. Crawford, 937 So.2d 446, 447 (¶ 6) (Miss.2006), the Mississippi Supreme Court again cited this principle, together with case citations, and held "there are numerous Mississippi cases which stand for the proposition that references to liability insurance are generally impermissible and constitute reversible error. See Jackson v. Daley, 739 So.2d 1031, 1039 (Miss. 1999); Morris v. Huff, 238 Miss. 111, 117-20, 117 So.2d 800, 802-03 (1960); Snowden v. Skipper, 230 Miss. 684, 697, 93 So.2d 834, 840 (1957); Avent v. Tucker, 188 Miss. 207, 225-26, 194 So. 596, 602 (1940); Herrin v. Daly, 80 Miss. 340, 341-42, 31 So. 790, 791 (1902)."